**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| MALCOLM ARCHIBALD, Individually and on behalf of all others similarly situated, )<br>)<br>) | Case No: |
| Plaintiff, )<br> ) | |
| v. ) | |
| ) | |
| NUTMEG STATE FINANCIAL CREDIT UNION, DOES 1 Through 100, )<br>)<br>) | |
| Defendants. )<br>) | August 16, 2021 |

_____

## CLASS ACTION COMPLAINT

Plaintiff Malcolm Archibald ("Plaintiff"), by his attorneys, hereby brings this class action against Nutmeg State Financial Credit Union and DOES 1 through 100 (collectively "Nutmeg" or "Defendant").

## I.    NATURE OF THE ACTION

1.    All allegations herein are based upon information and belief except those Allegations which pertain to Plaintiff or his counsel. Allegations pertaining to Plaintiff or his counsel are based upon, inter alia, Plaintiff's or his counsel's personal knowledge, as well as Plaintiff or his counsel's own investigation.  Furthermore, each allegation alleged herein either has evidentiary support or is likely to have evidentiary support, after a reasonable opportunity for additional investigation or discovery.

2.    Plaintiff has brought this class action to assert claims in his own right, and as the class representative of all other persons similarly situated.  Defendant wrongfully and without authorization, unilaterally and without warning, withdrew money from Plaintiff's and the Class Members' checking accounts when it was not authorized by contract, law, or equity to do so.

1

3.      Defendant falsely claimed that the funds it unilaterally took from Plaintiff's Account were properly assessed Non-Sufficient Funds ("NSF") fees (a fee for a transaction item that was returned unpaid) or overdraft fees (a fee for a transaction item that was advanced and paid by Defendant on behalf of Plaintiff).  However, Defendant was only authorized to assess one fee per transaction item and instead assessed multiple NSF fees for the same item in violation of its contracts and disclosures.

4.      This class action seeks monetary damages, restitution, and injunctive relief due to, *inter alia*, Defendant's policy and practice of unlawfully assessing and unilaterally collecting overdraft and NSF fees as set forth herein, in violation of its contract(s) with Plaintiff and the class, statutes and/or regulations, and equities.

## II.    **PARTIES**

5.      Plaintiff Malcolm Archibald is a resident of East Windsor, Connecticut, and a customer of Defendant at all relevant times.

6.      Based on information and belief, Defendant Nutmeg State Financial Credit Union is a state-chartered credit union headquartered in Rocky Hill, Connecticut, with an NCUA charter number of 68657.

7.      Without limitation, defendants DOES 1 through 100, include agents, partners, joint ventures, subsidiaries and/or affiliates of Defendant and, upon information and belief, also own and/or operate Defendant's branch locations. As used herein, where appropriate, the term "Defendant" is also inclusive of defendants DOES 1 through 100.

8.      Plaintiff is unaware of the true names of defendants DOES 1 through 100. Defendants DOES 1 through 100 are thus sued by fictitious names, and the pleadings will be amended as necessary to obtain relief against defendants DOES 1 through 100 when the true names are ascertained, or as permitted by law or the Court.

9.      There exists, and at all times herein mentioned existed, a unity of interest and ownership between the named defendants (including DOES) such that any corporate individuality and separateness between the named defendants has ceased, and that the named defendants are alter egos in that they effectively operate as a single enterprise, or are mere instrumentalities of one another.

10.     At all material times herein, each defendant was the agent, servant, co-conspirator and/or employer of each of the remaining defendants, acted within the purpose, scope, and course of said agency, service, conspiracy and/or employment and with the express and/or implied knowledge, permission, and consent of the remaining defendants, and ratified and approved the acts of the other defendants.  However, each of these allegations are deemed alternative theories whenever not doing so would result in a contradiction with the other allegations.

11.     Whenever reference is made in this Complaint to any act, deed, or conduct of Defendant, the allegation means that Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of Defendant's ordinary business and affairs.

12.     As to the conduct alleged herein, each act was authorized, ratified or directed by Defendant's officers, directors, or managing agents.

### III.      JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this case pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the aggregated claims of the individual class members exceed the sum of $5,000,000, exclusive of interest and costs; there are more than 100 putative class members defined below; and, on information and belief, there are numerous

members of the proposed class who are citizens of a state different from Defendant.

14.     Venue is proper in this District, among other reasons, pursuant to 28 U.S.C. § 1391(b), because Defendant entered into its contract with Plaintiff in this District; Defendant is headquartered in this District; Defendant breached its contract with Plaintiff in this District; Defendant regularly conducts business in this District; and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

### IV.    BACKGROUND ON DEFENDANT NUTMEG STATE FINANCIAL CREDIT UNION

15.     According to its website, Defendant is a credit union with 11 branch locations and customers in Connecticut.

### V.    CHECKING ACCOUNTS DEFENDANT OFFERS TO CUSTOMERS

16.     One of the main services Defendant offers to its members is a checking (share draft) account where consumers can deposit and withdraw their money.  The checking account can increase or be credited in a variety of ways, including automatic payroll deposits; electronic deposits; incoming transfers; deposits at the branch; and deposits at ATM machines.  Debits decreasing the amount in the checking account can be made by using a debit card for purchases of goods and services (point of sale purchases) that can be one-time purchases or recurring automatic purchases; through withdrawal of money at an ATM; or by electronic purchases. Additionally, some of the other ways to debit the account include writing checks; issuing electronic checks; scheduling Automated Clearing House (ACH) transactions (which can include recurring automatic payments or one-time payments); transferring funds; and other types of transactions that debit from a checking account.  Defendant is compensated for maintaining the checking account by earning interest on the money deposited by customers and then lent to other customers or parties and charging fees on the account. Defendant is only allowed to charge and

assess fees that are authorized by contract.

### VI.    CHECKING ACCOUNT OVERDRAFT AND NSF FEES GENERATE SIGNIFICANT PROFIT FOR THE DEFENDANT

17.     In connection with its processing of debit transactions (debit card, ATM, check, ACH, and other similar transactions), Defendant assesses overdraft fees (a fee for paying an overdrawn item) or NSF fees (a fee for return of an item due to an overdrawn account) to customer accounts when it claims to have determined that an account has been overdrawn.

### VII.    THE DETRIMENTAL EFFECT OF OVERDRAFT AND NSF FEES

18.     This case is about when and under what circumstances Defendant may charge an overdraft and/or NSF fee.

19.     The underlying principle for charging overdraft fees is that when the bank pays a transaction by advancing the bank's own funds instead of using a customer's insufficient funds, it may charge a contracted fee, provided that charging the fee is not prohibited by some legal regulation. This fee constitutes very expensive credit. According to the FDIC:

> For almost all study population banks operating an automated overdraft program, the main fee associated with the program was an NSF usage fee. Usage fees reported by these banks ranged from $10 to $38; the median fee was $27, charged on a per-transaction basis in almost all cases. **In this context, a $27 fee charged for a single advance of $60 that was repaid in two weeks roughly translated into an APR of 1,173 percent.** Many surveyed banks (24.6 percent) assessed additional fees on accounts that remained in negative balance status in the form of flat fees or interest charged on a percentage basis.

FDIC Study of Bank Overdraft Programs, 2008,

https://www.fdic.gov/bank/analytical/overdraft/fdic138_report_final_v508.pdf [last viewed April 22, 2020] (emphasis added).

20.     Financial institutions can also charge a contracted NSF fee when a customer's checking account purportedly lacks sufficient funds to cover an item and the financial institution

opts to return the transaction item unpaid rather than cover it.  Although there is very little, if

any, risk to financial institutions when they return an item unpaid, they still charge customers a

very expensive fee for this purported "service."

21.    The Consumer Financial Protection Bureau ("CFPB") has noted that, as

opposed to overdraft program coverage, financial institutions' return of items as unpaid, which

often results in the assessment and collection of insufficient funds fee charges (which the CFPB

refers to as "NSF fees"), confers little, if any, benefit to consumers:

> An important consumer outcome of any overdraft program is the
> percentage of negative transactions that are paid (i.e., result in
> overdrafts) or returned unpaid (i.e., were NSFs). Paying overdraft
> transactions may confer some benefit (in exchange for the
> associated fees and other costs) to consumers by helping them make
> timely payments and avoid late penalty fees and/or interest charges
> from a merchant or biller. **In contrast, returning an item generally
> confers little benefit to the consumer (other than perhaps
> deterring future overdrafting and any subsequent
> consequences) and can result in an NSF fee as well as additional
> related fees, such as a returned check fee charged by the
> institution to whom the check was presented or a late fee
> charged by the entity to whom payment was due.**

CFPB, CFPB Study of Overdraft Programs (June 2013), p. 26,

https://files.consumerfinance.gov/f/201306_cfpb_whitepaper_overdraft-practices.pdf [last

viewed April 22, 2020] (internal footnote omitted) (emphasis added).

22.    Overdraft and NSF fees constitute a primary revenue generator for banks and

credit unions. According to one banking industry market research company, Moebs Services,

banks and credit unions in 2018 alone generated an estimated $34.5 billion on overdraft fees.

Moebs Services, Overdraft Revenue Inches Up in 2018 (March 27, 2019),

http://www.moebs.com/Portals/0/pdf/Articles/Overdraft%20Revenue%20Inches%20Up%20in%

202018%200032719-1.pdf?ver=2019-03-27-115625-283.

23.    Since 2000, the average amount of checking account transactions has become much lower because customers, and especially young customers, use debit cards instead of cash or credit cards for everyday purchases. However, while the average transaction amount is substantially lower and provides much less risk and exposure to the bank if it causes an overdraft, the average cost of overdraft and NSF fees per transaction has gone up. In fact, the average overdraft fee at a bank is now $32, up from $20 in 2000, which far outpaced the rate of inflation during that time. *Id.*; MarketWatch, The Average Credit Union Overdraft Fee Has Almost Doubled Since 2000 (March 27, 2017) https://www.marketwatch.com/story/credit-unions-charge-almost-as-much-as-major-banks-in-overdraft-fees-2017-03-24 .

24.    Defendant's financial filings and practices reveal that it has followed these trends to the letter.  Defendant charges an overdraft and NSF fee of $35 per item, with a limit of 10 charges per day.  Even if Defendant had been properly charging overdraft and/or NSF fees, the $35 overdraft/NSF fee bears no relation to the bank's minute risk of loss or cost for administrating the Defendant's overdraft and NSF services.  Nevertheless, the practical effect of the fee is to charge those who pay it for overdraft purposes an interest rate with an APR in the thousands.

25.    Accordingly, the overdraft and NSF fee is a punitive fee rather than a service fee, which makes it even more unfair because most account overdrafts are accidental and involve a small amount of money in relation to the fee.

26.    Finally, the financial impact of these fees falls on the most vulnerable among the banking population with the least ability to absorb them.  Younger, lower-income, and non-white account holders are among those most likely to be assessed overdraft fees.  Pew Charitable Trust Report, Overdrawn, at p. 1 (June 2014), https://www.pewtrusts.org/-

/media/assets/2014/06/26/safe_checking_overdraft_survey_report.pdf .  A 25-year-old is 133%

more likely to pay an overdraft penalty fee than a 65-year-old.  *Id*. at p. 3.  More than 50% of the

customers assessed overdraft fees earned under $40,000 per year.  *Id*. at p. 4.  And non-whites

are 83% more likely to pay an overdraft fee than whites. *Id*. at p. 3.

## VIII.   ACCOUNTING TRICKS TO CHARGE OVERDRAFT AND NSF FEES ON AN ACCOUNT WITH SUFFICIENT  FUNDS TO PAY A TRANSACTION

27.     As a matter of background and to understand the banks' and credit unions'

improper overdraft practices, the various balances affecting customer checking accounts must be

understood.  Either unknown to customers, or confusing even if known by customers, there are

three balances associated with a checking account: the "balance;" the "collected available

balance;" and, the artificial "available balance."

28.     Not all these balances are equal.  There is one official and real balance.  It is often

referred to just as "balance," or a bank may call it "actual balance," "current balance," or "ledger

balance."  Whatever it is called, it is the money actually in the account without bookkeeping

adjustments for either upcoming authorized charges or holds the bank may place on deposits

already made and placed in the account.  It is the official balance of the account.  It is the balance

provided to customers in monthly statements, which are the official records of any account's

activity.  It is the balance used to determine interest on deposits and any minimum balance

requirements.  It is the balance used by Defendant to report its deposits to regulators,

shareholders, and the public.  It is the balance used in financial reports to shareholders and the

balance used for internal financial reporting.  And it is the balance used by credit reporting

agencies when they decide Defendant's credit ratings.

29.     The "collected balance" or "collected funds balance" is the "balance" less holds

placed on certain deposits pursuant to the financial institution's "Funds Availability Policy"

("FAP").

30.     The "available balance" is a completely different calculation from the "collected balance" or the real "balance."  It is an artificially created internal risk management calculation developed to determine which transactions to process and which to return in line with likely upcoming debit charges and deposits that did not clear the bank's or credit union's FAP.

31.     Over time, as financial institutions jumped on the overdraft and NSF fee train for revenue purposes, they decided to use their internal and artificial "available" balance not only for the legitimate use of managing pay or return decisions based on activities that it anticipated in the future, but also to assess overdraft and NSF fees on this artificial balance, rather than the real "balance." Generally, the result is that 10-20% of overdraft and NSF fees are assessed on transactions where sufficient money was in the account and thus it should not have been considered overdrawn.

32.     This practice is not only unfair on its face, but more importantly, financial institutions often do not contract with customers to authorize them to charge overdraft or NSF fees on transactions when the account had sufficient money to cover a transaction. The contracts with customers specifically state that such fees will be assessed only when there is insufficient money in the account to cover the transaction ("balance"). They do not contract with customers to use the artificial "available balance" for assessing overdraft and NSF fees.

## IX.     REPEAT FEES ON A SINGLE RETURNED TRANSACTION ALSO JUICES PROFITS

33.     Charging overdraft and NSF fees when there is money in an account to cover transaction is just one way that banks and credit unions manipulate checking accounts to increase profits. They also contract and disclose to customers that they will only charge a single NSF fee when they opt to return a check or ACH due to a lack of funds in the account.  For ACH charges,

the rejection of the electronic requested charge is completely automated, and results in no risk or

cost to the financial institution.  There is also virtually no cost to administer the rejection as it is

an automated computer function.  However, the NSF fee is the same as if the transaction was

paid into overdraft by the financial institution.  But what is worse, financial institutions like

Defendant not only charge one NSF fee for a returned item ($30 here), they charge multiple fees

for insufficient funds on the same item and attempt to justify the practice as caused by a

merchant submitting the same item for payment multiple times.

34.    Not only is this an unfair charge, it is not authorized by Defendant's contracts

with customers.  Those contracts do not disclose or permit the charging of multiple NSF fees

based on the same transaction with the same merchant.  Nor do they permit charging an NSF fee

followed by an overdraft fee on the same item if the item is paid into overdraft on a second

presentment.  Instead, the agreements identify an insufficient funds fee as being singular on a per

transaction, or item, basis.

## X.    HOW SOME BANKS AND CREDIT UNIONS HAVE DISCLOSED THAT A SINGLE NSF ITEM CAN RESULT IN MULTIPLE OVERDRAFT FEES

35.    Unlike Defendant here, other banks and credit unions have been able to

properly contract and disclose the practice of charging multiple fees for the representment of the

same item. For example, Air Academy Federal Credit Union clearly states: an NSF fee is

"$32.00 per presentment." (Emphasis added.)

36.    Central Pacific Bank contracts unambiguously:

>    Items and transactions (such as, for example, checks and electronic transactions/payments) returned unpaid due to insufficient/non-sufficient ("NSF") funds in your account, **may be resubmitted one or more times for payment, and a $32 fee will be imposed on you each time an item and transaction resubmitted for payment is returned due to insufficient/nonsufficient funds.**

(Emphasis added.)

37.     Delta Community Credit Union states its NSF fee is "$35 **per presentment**."

(Emphasis added.) Further, in its Account Agreement, Delta unambiguously states as follows:

> The Credit Union reserves the right to charge you an overdraft/insufficient funds fee if you write a check or initiate an electronic transaction that, if posted, would overdraw your Checking Account. **Note that you may be charged an NSF fee each time a check or ACH is presented to us, even if it was previously submitted and rejected.**

(Emphasis added.)

38.     Glendale Federal Credit Union lists its NSF fee as "$30 **per presentment**."

(Emphasis added.)

39.     First Financial Bank contracts unambiguously:

> Merchants or payees may present an item multiple times for payment if the initial or subsequent presentment is rejected due to insufficient funds or other reason (representation). **Each presentment is considered an item and will be charged accordingly."**

(Emphasis added.)

40.     First Northern Credit Union lists its NSF fee as "$22.00 per each presentment and any subsequent presentment(s)." Further, in its Account Agreement, First Northern unambiguously states as follows:

> You further agree that **we may charge a NSF fee each time an item is presented for payment even if the same item is presented for payment multiple times.** For example, if you wrote a check to a merchant who submitted the payment to us and we returned the item (resulting in a NSF fee), the merchant may re- present the check for payment again. If the second and any subsequent presentments are returned unpaid, **we may charge a NSF fee for each time we return the item. You understand this means you could be charged multiple NSF fees for one check** that you wrote as that check could be presented and returned more than once. **Similarly,**

if you authorize a merchant (or other individual or entity) to electronically debit your account, such as an ACH debit, **you understand there could be multiple submissions of the electronic debit request which could result in multiple NSF fees.**

(Emphasis added.)

41.     Liberty Financial states its NSF fee is "27.00 **per presentment**." (Emphasis added.)

42.     Los Angeles Federal Credit Union lists its NSF fee as "$29 **per presentment**." (Emphasis added.)

43.     Members First Credit Union states:

We reserve the right to charge an Non-Sufficient Funds Fee (NSF Fee) each time a transaction is presented if your account does not have sufficient funds to cover the transaction at the time of presentment and we decline the transaction for that reason. **This means that a transaction may incur more than one Non-Sufficient Funds Fee (NSF Fee) if it is presented more than once...we reserve the right to charge a Non-Sufficient Funds (NSF Fee) for both the original presentment and the representment** . . . .

(Emphasis added.)

44.     Meriwest Credit Union lists its fee as "$35.00/item **per presentment**." (Emphasis added.)

45.     Partners 1st Federal Credit Union states:

Consequently, because **we may charge a fee for an NSF item each time it is presented, we may charge you more than one fee for any given item.** Therefore, multiple fees may be charged to you as a result of a returned item and resubmission regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the item.

(Emphasis added.)

46.     Regions Bank states:

> If an item is presented for payment on your account at a time when
> there is an insufficient balance of available funds in your account to
> pay the item in full, you agree to pay us our charge for items drawn
> against insufficient or unavailable funds, whether or not we pay the
> item. **If any item is presented again after having previously been**
> **returned unpaid by us, you agree to pay this charge for each**
> **time the item is presented for payment and the balance of**
> **available funds in your account is insufficient to pay the item.**

(Emphasis added.)

47.     Tyndall Federal Credit Union lists its NSF fee as "$28.00 per presentment

(maximum 5 per day)." (Emphasis added.)

## XI.     FACTUAL ALLEGATIONS AGAINST DEFENDANT

48.     At all relevant times, Defendant has had an overdraft and NSF fee program in

place which, *inter alia*, is: 1) contrary to the express and implied terms of its contracts with

customers; 2) contrary to Defendant's representations about its overdraft and NSF fee program to

its customers; and 3) contrary to its customers' expectations regarding the assessment of such

fees.

49.     Defendant has an improper practice of charging multiple fees for the same

electronic transaction or item.  Defendant charges a $35 fee when an electronic transaction or

item is first processed for payment and Defendant determines that there is not enough money in

the account to cover the transaction.  Defendant then charges an additional NSF or overdraft fee

if the same item is presented for processing again by the payee.

50.     Defendant's practice of charging additional NSF or overdraft fees for the

representment of the same item violates its "Membership and Account Agreement" (hereinafter

"Account Agreement").  The Account Agreement is a uniform written contract that Defendant

entered with Plaintiff and the other Class Members.  The Account Agreement states, "If, on any

day, the available funds in your share or deposit account are not sufficient to pay the full amount

of *a check, draft, transaction, or other item*, plus any applicable fee, that is posted to your account, *we may return the item or pay it,* as described below." (emphasis added). Additionally, the Account Agreement states, "We do not have to notify you if your account does not have sufficient available funds in order to *pay an item*." (emphasis added). In other words, the Account Agreement drafted by Defendant states, in the singular, "*a* charge for *each item*" will be assessed; not plural "multiple insufficient funds fees" will be assessed. Furthermore, the fee schedule also states that fees are charged "*per item*" in the singular. Further "an item" means a single electronic transaction, and a "representment" or "retry" of "an item" does not change it into a new or different item. It is still the same "item" being presented by the same merchant in the same dollar amount; not a new "item." An electronic item reprocessed after an initial return for insufficient funds, especially through no action by the customer, cannot and does not fairly become a new, unique additional "item" for fee assessment purposes. Furthermore, although Plaintiff is unaware at this time whether Defendant's Fee Schedule was ever served on Class Members in a manner required to make it effective, and this will require discovery, the Fee Schedule lacks any language indicating charging multiple NSF fees on the same transaction.

51.     Defendant's standardized Account Agreement and Fee Schedule did not disclose the practice of assessing multiple fees for a single item and misrepresented to customers that Defendant would only charge a single fee per item. Further, because Defendant charged NSF fees improperly, and because Defendant's improper deduction of the additional improper $30 fee from a customer's account further decreased the customer's "balance" or "available balance," it likely generated even more NSF fees or overdraft fees to the account.

52.     Courts in various jurisdictions have recognized that when banks and credit unions charge multiple NSF fees on the same item while failing to clearly disclose such practice, it gives

rise to claims and causes of action on a class wide basis. *See e.g.*, *Petrey, v. Visions Federal Credit Union*, No. 320CV1147MADML, 2021 WL 2364971 (N.D.N.Y. June 9, 2021) (denying motion to dismiss claims regarding multiple NSF fees on a single item); *Morris v. Bank of America*, No. 3:18-cv-00157-RJC-DSC, 2019 WL 1274928 (W.D.N.C. Mar. 29, 2019) (Order denying motion to dismiss allegations regarding improper repeat NSF claims); *Tannehill v. Simmons Bank*, No. 3:19-cv-140-DPM, Docket No. 23 (E.D. Ark. Oct. 21, 2019) (Order denying motion to dismiss repeat NSF claims); *Garcia v. UMB Bank NA*, No. 1916-CV01874 (Jackson Co., Missouri, Circuit Court Oct. 18, 2019) (Order denying motion to dismiss repeat NSF claims); *Tisdale v. Wilson Bank and Trust*, No. 19-400-BC (Davidson Co. Tenn., Chancery Court, Oct. 17, 2019) (Order denying motion to dismiss repeat NSF claims); *Noe v. City National Bank of West Virginia*, Civil Action No. 3:19-0690 (S.D.W.V. Feb. 19, 2020) (Order denying motion to dismiss repeat NSF claims); *Ingram v. Teachers Credit Union*, Cause No. 49D01-1908-PL- 035431 (Indiana Commercial Court, Marion County Superior Court) (Order denying motion to dismiss repeat NSF claims); *Perks, et al. v. TD Bank, N.A.*, Civil Action No. 18-CV-11176 (S.D.N.Y. Mar. 17, 2020) (Order denying motion to dismiss breach of contract claim for repeat NSF fees); and *Coleman, et al. v. Alaska USA Federal Credit Union*, Civil Action No. 3:19-cv- 0229-HRH (D. Alaska Apr. 14, 2020) (Order denying motion to dismiss Plaintiff' breach of contract and good faith and fair dealing claims for repeat NSF fees).

53.    Plaintiff and the Class Members have performed all conditions, covenants, and promises required by each of them in accordance with the terms and conditions of the contracts.

54.    Meanwhile, Plaintiff and the Class Members could not have reasonably anticipated the harm resulting from Defendant's practice throughout the class period because the Account Agreement and Fee Schedule specifically stated that only a singular fee would be

charged for "an" item.

55.    Therefore, Plaintiff, on behalf of himself and all others similarly situated, seeks relief as set forth below.

## XII.    PLAINTIFF HAS BEEN DAMAGED AND HAS STANDING TO BRING THIS LAWSUIT

56.    Plaintiff and the Class Members were harmed by Defendant's policy and practice of charging an NSF fee more than once for the same "item."  By doing so, Defendant breached its contracts.

57.    It will be necessary to obtain Defendant's records to determine each instance such wrongful fees were charged; however, Plaintiff has already uncovered some examples. Specifically, Plaintiff was charged one NSF fee on a Paypal transaction on November 23, 2020, two NSF fees on two Paypal transactions on November 27, 2020, two NSF fees on two Paypal transactions on November 30, 2020, and one NSF fee on a Paypal transaction on December 3, 2020.  However, what was not authorized by the Account Agreement was Defendant charging Plaintiff another six retry fees on those transactions—one retry on November 27, 2020, two retries on December 2, 2020, one retry on December 3, 2020, and one retry on December 8, 2020—totaling $210.  In charging a second $35 fee for the same items, Defendant increased the fee these returned items from $210 to $420.  This multiplication of fees was not authorized and is in direct conflict with the Account Agreement and Fee Schedule that identifies a $35 fee for an NSF returned item—not a $70 fee.

58.    Defendant's assessment, and unilateral taking of, improper NSF fees further reduced the balance and amount of funds in customers' accounts, resulting in and aggressively causing subsequent, otherwise non-overdraft or non-NSF transactions to be improperly treated as transactions for which Defendant assessed further overdraft or NSF fees.  A complete evaluation

of Defendant's records is necessary to determine the full extent of Plaintiff's and Class

Members' harm from this practice.

## XIII.  <u>CLASS ACTION ALLEGATIONS</u>

59.    The preceding allegations are incorporated by reference and re-alleged as if fully

set forth herein.

60.    Plaintiff Encarnacion bring this case, and each of his causes of action, as a class

action pursuant to Federal Rules of Civil Procedure, Rule 23(a), (b)(1), (b)(2) and (b)(3) on

behalf of the following Class.

61.    The "Class" is composed of the following:

> **All members/customers who have or have had accounts with
> Defendant who incurred more than one NSF fee or an NSF fee
> followed by an overdraft fee for the same item during the period
> beginning six years preceding the filing of the Complaint and
> ending on the date the Class is certified.**

62.    Excluded from the Classes are: 1) any entity in which Defendant has a controlling

interest; 2) officers or directors of Defendant; 3) this Court and any of its employees assigned to

work on the case; and 4) all employees of the law firms representing Plaintiff and the Class

Members.

63.    This action has been brought and may be properly maintained on behalf of each

member of the Class pursuant to Federal Rules of Civil Procedure, Rule 23.

64.    **Numerosity (Federal Rules of Civil Procedure, Rule 23(a)(1))** – The members

of the Class are so numerous that joinder of all members would be impracticable. While the

exact number of Class Members is presently unknown to Plaintiff, and can only be determined

through appropriate discovery, Plaintiff believes based on the percentage of customers that are

harmed by these practices with banks with similar practices, that the Class is likely to include

thousands of members.

65.     Upon information and belief, Defendant has databases, and/or other documentation, of its customers' transactions and account enrollment.  These databases and/or documents can be analyzed by an expert to ascertain which of Defendant's customers has been harmed by its practices and thus qualify as a Class Member.  Further, the Class definition identifies a group of unnamed Plaintiff by describing a set of common characteristics sufficient to allow a member of that group to identify himself or herself as having a right to recover.  Other than by direct notice through mail or email, alternative proper and sufficient notice of this action may be provided to the Class Members through notice published in newspapers or other publications.

66.     **Commonality (Federal Rules of Civil Procedure, Rule 23(a)(2))** – This action involves common questions of law and fact. The questions of law and fact common to both Plaintiff and the Class Members include, but are not limited to, the following:

- whether, pursuant to the Account Agreement and/or Fee Schedule, Defendant contracted that it would only charge "a" single fee for an NSF "item" rather than charge repeat fees for the same "item";

- whether defendant breached the Account Agreement and/or Fee Schedule by assessing repeat fees on the same "item";

- whether the language in the Account Agreement and/or Fee Schedule is ambiguous; and whether Defendant is liable for breach of contract, breach of the covenant of good faith and fair dealing, unjust enrichment, and money had and received.

67.     **Typicality (Federal Rules of Civil Procedure, Rule 23(a)(3))** – Plaintiff's claims are typical of all Class Members.  The evidence and the legal theories regarding Defendant's alleged wrongful conduct committed against Plaintiff and all of the Class Members

are substantially the same because all of the relevant agreements between Defendant and its customers were identical as to all relevant terms, and also because, *inter alia*, the challenged practice of charging customers multiple fees for the same item was uniform for Plaintiff and all Class Members.  Accordingly, in pursuing his own self-interest in litigating his claims, Plaintiff will also serve the interests of the other Class Members.

68.    **Adequacy (Federal Rules of Civil Procedure, Rule 23(a)(4))** – Plaintiff will fairly and adequately protect the interests of the Class Members.  Plaintiff has retained competent counsel experienced in class action litigation to ensure such protection.  There are no material conflicts between the claims of the representative Plaintiff and the members of the Class that would make class certification inappropriate.  Plaintiff and his counsel intend to prosecute this action vigorously.

69.    **Predominance and Superiority (Federal Rules of Civil Procedure, Rule 23(b)(3))** – The matter is properly maintained as a class action under Rule 23(b)(3) because the common questions of law or fact identified herein and to be identified through discovery predominate over questions that may affect only individual Class Members.  Further, the class action is superior to all other available methods for the fair and efficient adjudication of this matter. Because the injuries suffered by the individual Class Members are relatively small, the expense and burden of individual litigation would make it virtually impossible for Plaintiff and Class Members to individually seek redress for Defendant's wrongful conduct.  Even if any individual person or group(s) of Class Members could afford individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed. The class action device is preferable to individual litigation because it provides the benefits of unitary adjudication, economies of scale, and comprehensive adjudication by a single court. In contrast,

the prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for the party (or parties) opposing the Class and would lead to repetitious trials of the numerous common questions of fact and law. Plaintiff know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. As a result, a class action is superior to other available methods for the fair and efficient adjudication of this controversy. Absent a class action, Plaintiff and the Class Members will continue to suffer losses, thereby allowing Defendant's violations of law to proceed without remedy and allowing Defendant to retain the proceeds of its ill-gotten gains.

70.     Plaintiff is not aware of any separate litigation instituted by any of the Class Members against Defendant.  Plaintiff does not believe that any other Class Members' interests in individually controlling a separate action are significant, in that Plaintiff has demonstrated above that his claims are typical of the other Class Members and that he will adequately represent the Class.  This particular forum is desirable for this litigation because Defendant's headquarters are located in this District and the claims arose from activities that occurred largely in this District.  Plaintiff does not foresee significant difficulties in managing the class action in that the major issues in dispute are susceptible to class proof.

71.     Plaintiff anticipates the issuance of notice, setting forth the subject and nature of the instant action, to the proposed Class Members.  Upon information and belief, Defendant's own business records and/or electronic media can be utilized for the contemplated notices. To the extent that any further notices may be required, Plaintiff anticipates using additional media and/or mailings.

72.     This matter is properly maintained as a class action pursuant to Rule 23(b) of the Federal Rules of Civil Procedure in that without class certification and determination of declaratory, injunctive, statutory and other legal questions within the class format, prosecution of separate actions by individual members of the Class will create the risk of:

- inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the parties opposing the Class; or

- adjudication with respect to individual members of the Class would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests.

73.     Common questions of law and fact exist as to the members of the Class and predominate over any questions affecting only individual members, and a class action is superior to other available methods of the fair and efficient adjudication of the controversy, including consideration of:

- the interests of the members of the Class in individually controlling the prosecution or defense of separate actions;

- the extent and nature of any litigation concerning the controversy already commenced by or against members of the Class;

- the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and,

- the difficulties likely to be encountered in the management of a class action.

## XIV.   <u>FIRST CAUSE OF ACTION</u>

### <u>(Breach of the Account Agreement)</u>

### <u>(By Plaintiff, individually and on behalf the Class)</u>

74.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

75.    Plaintiff and each of the Class Members entered into the Account Agreement with Defendant covering the subject of NSF and overdraft fees.  This contract was drafted by and is binding on Defendant.

76.    Among other promises Defendant made in the Account Agreement, Defendant promised that it would assess only a single NSF fee for an unpaid, returned item due to purported insufficient funds when, in practice, it charged a $30 fee when an electronic transaction or item was first processed for payment and Defendant determined that there was not enough money in the account to cover the transaction, and then charged an additional NSF or overdraft fee if the same item was presented for processing again by the payee, even though the account holder took no action to resubmit the item for payment.

77.    Defendant's practice violates its Account Agreement, which states, "If, on any day, the available funds in your share or deposit account are not sufficient to pay the full amount of *a check, draft, transaction, or other item*, plus any applicable fee, that is posted to your account, *we may return the item or pay it,* as described below."  (Emphasis added.).  Additionally, the Account Agreement states, "We do not have to notify you if your account does not have sufficient available funds in order to *pay an item*.  Your account may be subject to *a charge for each item* regardless of whether we pay or return the item."  This means that Defendant can assess a singular "charge" for "an item."  Yet Defendant wrongfully treated a

"retry" or "representation" of an item as a new and separate "item" justifying additional NSF or overdraft fees in violation of the Account Agreement.

78.    Plaintiff and the Class Members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the Account Agreement, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

79.    Defendant breached the terms of the Account Agreement by, *inter alia*, assessing multiple fees for the same electronic transaction or item.

80.    As a proximate result of Defendant's breaches, Plaintiff and the Class Members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

## XV.    SECOND CAUSE OF ACTION

### (Breach of the Implied Covenant of Good Faith and Fair Dealing) (By Plaintiff, individually and on behalf the Class)

81.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

82.    Plaintiff and each of the Class Members entered into the Account Agreement with Defendant covering the subject of overdraft and NSF transactions.  The Account Agreement was drafted by and is binding upon Defendant.  In the agreement, Defendant promised that it would only charge a single fee for an item.  Yet Defendant assessed NSF and/or overdraft fees multiple times for the same electronic item.

83.    Further, good faith is an element of every contract. Whether by common law or statute, all contracts impose upon each party a duty of good faith and fair dealing.  Good faith

and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain.  Thus, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit of the bargain and abusing the power to specify terms, constitute examples of bad faith in the performance of contracts.

84.    The material terms of the Account Agreement therefore include the implied covenant of good faith and fair dealing, whereby Defendant covenanted that it would, in good faith and in the exercise of fair dealing, deal with Plaintiff and each Class Member fairly and honestly and do nothing to impair, interfere with, hinder, or potentially injure Plaintiff's and the Class Members' rights and benefits under the contracts.

85.    Plaintiff and the Class Members have performed all conditions, covenants, and promises required by each of them on their part to be performed in accordance with the terms and conditions of the contracts, except for those they were prevented from performing or which were waived or excused by Defendant's misconduct.

86.    Defendant breached the implied covenant of good faith and fair dealing based, *inter alia*, on its practices of assessing multiple fees for a single, unpaid returned item, or by assessing an overdraft fee on the same item that was previously assessed an NSF fee.  Defendant could easily have avoided acting in this manner by simply changing the programming in its software to charge a fee only once per item.  Instead, Defendant unilaterally elected to and did program its software to charge multiple fees each time the same item was represented for payment by a merchant which would maximize its overdraft and NSF fees. In so doing, and in implementing its overdraft and NSF fee programs for the purpose of increasing and maximizing overdraft and NSF fees, Defendant executed its contractual obligations, including any discretion

it had, in bad faith, depriving Plaintiff and the Class Members of the full benefit of the Account Agreement.

87.    As a proximate result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiff and the Class Members have been damaged in an amount to be proven at trial and seek relief as set forth in the Prayer below.

## XVI.    THIRD CAUSE OF ACTION

### (Unjust Enrichment/Restitution)

### (By Plaintiff individually and on behalf the Class)

88.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

89.    As a result of the wrongful misconduct alleged above, Defendant unjustly received millions of dollars in overdraft and NSF fees.

90.    Because Plaintiff and the Class Members paid the erroneous overdraft and NSF fees assessed by Defendant, Plaintiff and the Class Members have conferred a benefit on Defendant, albeit undeservingly.  Defendant has knowledge of this benefit, as well as the wrongful circumstances under which it was conveyed, and yet has voluntarily accepted and retained the benefit conferred.  Should it be allowed to retain such funds, Defendant would be unjustly enriched.  Therefore, Plaintiff and the Class Members seek relief as set forth in the Prayer below.

## XVII.  FOURTH CAUSE OF ACTION

### (Money Had and Received)

### (By Plaintiff individually and on behalf the Class)

91.    The preceding allegations are incorporated by reference and re-alleged as if fully

set forth herein.

92.     Defendant has obtained money from Plaintiff and the Class Members by the exercise of undue influence, menace or threat, compulsion or duress, and/or mistake of law and/or fact.

93.     As a result, Defendant has in its possession money which, in equity, belongs to Plaintiff and the Class Members, and thus, this money should be refunded to Plaintiff and the Class Members.  Therefore, Plaintiff and the Class Members seek relief as set forth in the Prayer below.

## XVIII. <u>PRAYER</u>

WHEREFORE, PLAINTIFF and CLASS MEMBERS pray for judgment as follows:

1. For an order certifying this action as a class action;

2. For compensatory damages on all applicable claims and in an amount to be proven at trial;

3. For an order requiring Defendant to disgorge, restore, and return all monies wrongfully obtained together with interest calculated at the maximum legal rate;

4. For statutory damages;

5. For an order enjoining the wrongful conduct alleged herein;

6. For costs;

7. For pre-judgment and post-judgment interest as provided by law;

8. For common law punitive damages for malicious conduct;

9. For attorneys' fees under the common fund doctrine, and all other applicable law; and

10. For such other relief as the Court deems just and proper.

## XIX. <u>DEMAND FOR JURY TRIAL</u>

Plaintiff and the Class Members demand a trial by jury on all issues so triable.

Dated: August 16, 2021                    Respectfully Submitted,

*/s/ Richard E. Hayber*

Richard E. Hayber
rhayber@hayberlawfirm.com
Bar No.: CT11629
**Hayber, McKenna & Dinsmore, LLC**
750 Main Street, Suite 904
Hartford, CT 06106
Telephone: (860) 522-8888
Facsimile: (860) 218-9555

Elaine S. Kusel, NJ Bar No. 319302020*
esk@mccunewright.com
Sherief Morsy, NJ Bar No. 125042015*
sm@mccunewright.com
**McCune Wright Arevalo, LLP**
One Gateway Center, Suite 2600
Newark, NJ 07102
Telephone: (909) 557-1250
Facsimile: (909) 557-1275

Richard D. McCune, CA Bar No. 132124*
rdm@mccunewright.com
**McCune Wright Arevalo, LLP**
3281 East Guasti Road, Suite 100
Ontario, CA 91761
Telephone: (909) 557-1275
Facsimile: (909) 557-1275

Attorneys for Plaintiff Malcolm Archibald,
and the Putative Class

*_Pro Hac Vice_ application to be submitted